**Opinion issued March 14, 2024**



In The

# Court of Appeals

For The

## First District of Texas

_____

### NO. 01-22-00237-CR
_____

**SALVADOR JIMENEZ CORONADO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 482nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1664386**

---

## MEMORANDUM OPINION

A jury found appellant, Salvador Jimenez Coronado, guilty of the felony offense of aggravated sexual assault of a child[1] and assessed his punishment at confinement for fifteen years. In three issues, appellant contends that the trial

---

[1] *See* TEX. PENAL CODE ANN. §§ 22.021(a), (e).

court lacked jurisdiction and the trial court erred in denying appellant's motion for directed verdict and admitting certain evidence.

We affirm.

## Background

The complainant, A.C., testified that as a child he lived with his mother (the "complainant's mother"), his three sisters—R.C., L.C., and V.C.—and appellant, an adult male, in an apartment in Harris County, Texas. Appellant was not the complainant's biological father. Appellant moved in with the complainant's family when the complainant was in the third grade. The complainant's mother worked a lot when he was a child, so he did not see her that often. According to the complainant, his mother left for work around 6:00 a.m. She would also sometimes work in the evenings or overnight.

As to his sisters, the complainant explained that R.C. was about four years older than he was, and she was "pretty much the maternal figure." L.C. was close in age to the complainant, and V.C. was five years younger than the complainant. V.C. was about one year old when appellant moved in with the complainant's family, and for most of her childhood, she did not know that appellant was not her biological father.

Regarding the apartment where the family lived, the complainant testified that the complainant's mother and appellant slept in the primary bedroom. The

complainant's sisters slept in the second bedroom in the apartment, and the complainant slept in the living room on the couch.

Appellant worked as a painter, and he worked while the children were at school. Appellant would return to the apartment after work either with the complainant's mother or by himself. Most evenings, appellant was alone with the complainant and the complainant's sisters in the apartment, and appellant would usually stay in his room during that time with the door locked. When the complainant went to bed at night, typically appellant was the only adult at home.

The complainant further testified that one day, when he was in the third grade, he and L.C. got off the school bus after school and a man approached them and masturbated in front of them. They went home and told R.C. about the incident, and R.C. told the complainant's mother and appellant. The next day, the complainant and appellant were alone in the family's apartment, and appellant called the complainant to come into appellant's bedroom. Appellant then asked the complainant about the masturbation incident. Appellant was laying down on the bed in his room and masturbating under the bed covers while he spoke to the complainant. The complainant told appellant that he saw the man's "private area." Appellant then asked the complainant, "Did it look like this?," and showed the complainant his erect penis. The complainant felt scared and shocked and did not "know what was going on." The complainant asked appellant why he was asking

questions about the masturbation incident, but appellant did not have a good answer. Appellant then told the complainant to leave the bedroom. The complainant did not tell anyone about what had happened because he "didn't know what to do at that point." And he felt like his mother was "serious" about her relationship with appellant because she brought him to live in the apartment with the family.

After the above-described incident, appellant began to find "any excuse to make [the complainant] go to [appellant's] room" whenever the complainant was home alone.[2] Appellant would yell to the complainant from his bedroom and ask the complainant to bring him a drink. The complainant would do what appellant asked because when he did not, appellant would tell the complainant's mother that the complainant was being disrespectful. Each time the complainant went into appellant's bedroom, appellant would bring up the masturbation incident again and ask the complainant "[s]o [was] there anything that you wanted to do to that guy." The complainant felt pressured into "saying yes" and that he did want "to do something to th[e] guy." Appellant told the complainant that he might like to "touch" a penis and he would not "know unless [he] tr[ied]." Appellant told the complainant to touch appellant's penis, and the complainant complied.

---

[2]     The complainant noted that anytime he was alone in appellant's bedroom, appellant told him to close the door and lock it.

4

The complainant further testified that one night, when he was still in the third grade, appellant called for the complainant, who was in the living room, and told him to come into appellant's bedroom. When the complainant entered the room, appellant was watching the television and masturbating under the bed covers. Appellant wanted to talk about the masturbation incident again, and he asked the complainant "[i]s there something that you want to do." The complainant responded, "I don't know. Is there something that you need me to do?" Appellant told the complainant that he could touch appellant's penis and he would not get in trouble. The complainant gave in and "started . . . masturbating [appellant]." Appellant gave the complainant instructions on what to do.

At the time, the complainant's sisters were asleep in their bedroom and the complainant's mother was at work. The complainant felt that he had to do whatever appellant told him to do because if he did not appellant would "find a way to get [the complainant] punished." And the complainant felt that he would get in trouble if he did not touch appellant's penis. The complainant stopped masturbating appellant and left appellant's bedroom when the complainant's mother called appellant and told him that she was on her way home from work. Appellant told the complainant to pretend that he was asleep in the living room when the complainant's mother got home.

The next morning, the complainant asked his mother if appellant had told her anything about the day before, and the complainant's mother said no. The complainant thought that appellant "would tell her," and that if he had not, then it meant that what had happened was not a big deal. The complainant was also worried about getting into trouble, and appellant had told the complainant not to tell his mother or sisters.

The complainant further explained that appellant continued having the complainant masturbate appellant frequently, and it would usually happen at nighttime.[3] The complainant explained that appellant made him feel guilty about what was happening and that it was the complainant's own fault or that the complainant "wanted it." Appellant told the complainant, "This is what you asked for," and if the complainant said something about what was happening, it would "cause [the complainant's] family to . . . go in[to] turmoil"—his sisters would be separated, and the complainant's mother would be deported.[4] Appellant stopped

---

[3]  The complainant estimated that the sexual interactions with appellant happened about five times a month. They occurred until the complainant was in the eighth grade, and then started again when the complainant was in high school.

[4]  At one point, when the complainant was in the fourth grade, he spoke to R.C. about what had been happening to him. R.C. had asked the complainant why appellant "ke[pt] telling [him] to go into [appellant's] room," and the complainant said it was because appellant would tell him to "do things with him." The complainant explained to R.C. what appellant had been asking him to do. R.C. told the complainant that the same thing had been happening to her. R.C. also stated that she had told their grandmother about what had been happening to her, and the grandmother had spoken with the complainant's mother. Because the

short of threatening to physically harm the complainant though or the complainant's family.

According to the complainant, during the summer between the third and fourth grades, appellant would try to "get [the complainant] alone" in the apartment during the day. Sometimes, the complainant's mother would go to church and appellant would tell the complainant to "stay home" or he would suggest that the complainant's mother take just the complainant's sisters to church. Appellant would also take the complainant to work with him, and if they were alone, appellant would "make [the complainant] touch" appellant's penis and masturbate appellant. Eventually, the complainant told his mother that he did not want to go to work with appellant anymore.

Further, when the complainant was in the fourth grade, appellant told the complainant to put his mouth on appellant's penis, and the complainant complied. Appellant then pushed the complainant's head down. Appellant rubbed the complainant's bare bottom while this occurred.[5] Appellant also had pornography playing on the television in his bedroom. Appellant ejaculated in front of the complainant. The complainant's mother was at work when this incident occurred.

_____

complainant's mother did not believe R.C., R.C. told the complainant that no one would believe them if they said anything to another adult.

[5] The complainant also explained that appellant would put his finger in the complainant's anus when the complainant was masturbating appellant or engaging in oral sex.

7

As to another incident, the complainant explained that when he was about ten or eleven years old, appellant lined the complainant and the complainant's sisters up in the living room and asked them if they knew "what a pussy [was]?" When the complainant asked if he "ha[d] one," appellant got mad and took the complainant and R.C. into the bathroom in the apartment. Appellant made R.C. take down her pants and underwear and instructed her to get in a certain position. He then told the complainant, "This is what a pussy is." Appellant also put his fingers inside R.C.'s vagina and told the complainant, "[H]ere's where you will put your penis." R.C. was crying and in pain. Appellant then told R.C. to pull her pants up, and they all left the bathroom.

On another occasion, when the complainant was roughly the same age, appellant called the complainant to come into his bedroom. R.C. was already in the room, and appellant was masturbating under the bed covers. Appellant told the complainant to take off his clothes, and the complainant took off his pants and underwear. Appellant told R.C. to do the same thing. Appellant then put his fingers in R.C.'s vagina and instructed the complainant to make his penis "hard." Appellant made R.C. turn around, and instructed the complainant to start having

sexual intercourse with R.C. When R.C. started bleeding, she ran out of the room, and the complainant followed her out.[6]

When the complainant was in the seventh grade and about thirteen years old, his family and appellant moved to a house in a different area of Harris County. In the house, the complainant had his own bedroom, the complainant's sisters shared a bedroom, and appellant and the complainant's mother shared a bedroom. Around that time, appellant was "laid off from work," and he did not have a steady job. When the complainant would get home from school, he and his sisters were often alone in the house with appellant.

On one occasion after the move, appellant started masturbating in front of the complainant while they were in the primary bedroom. Appellant then told the complainant to put his mouth on appellant's penis, and the complainant complied. According to the complainant, appellant "just had a way of just . . . making [him] do it." While in the new house, the sexual interactions between appellant and the complainant happened frequently.

Additionally, when the complainant was about fifteen years old,[7] appellant told him to put on a pair of the complainant's mother's underwear. Appellant was

---

[6] The complainant also testified that once, when he was in the fifth grade, appellant asked him to take photographs of the complainant's sisters when they were in the shower. The complainant said no and told appellant that he did not "want [appellant] touching or hurting [his] sisters."

9

playing pornography on the television in his bedroom, and he had the complainant stand in front of the television and squat down. Appellant masturbated while watching the complainant do this. Appellant then had the complainant come near him and asked the complainant if he "wanted to do it," meaning to let appellant penetrate his anus. Appellant moved the underwear the complainant was wearing to the side, and appellant's penis made contact with the complainant's anus. The complainant felt really scared and told appellant, "I'm not going to do it." Appellant got mad at him and said, "Get the fuck out of here." (Internal quotations omitted.) According to the complainant, appellant did not penetrate his anus, but "rub[bed] his penis on [the complainant's] anal area."

The complainant further testified that when he was about sixteen years old, appellant and the complainant "got in a physical argument." The complainant was upset that appellant was not working and told appellant, "Dude, what are you doing? Like, you're just here wasting space, wasting time, and you can't even get a job." Appellant got very angry and started choking the complainant. The complainant's mother separated them. That day, appellant and the complainant's mother separated, and appellant left the house.[8]

---

[7] The complainant also testified that one night, when the complainant was about fifteen years old, appellant put his mouth on the complainant's penis.

[8] The complainant noted that appellant and the complainant's mother stayed in contact for years after the physical altercation.

At some point, after the complainant had graduated from high school, L.C. told the complainant's mother about what appellant had done to her. The complainant also told his mother what had happened between appellant and him, but he did not give his mother all the details because he felt like she did not "want [the] details." After telling his mother, the complainant went to speak to law enforcement officers.

R.C. testified that the complainant, L.C., and V.C. are her siblings and she is the oldest. R.C. was three years older than L.C. and four years older than the complainant. R.C. and her siblings had the same biological father, but he stopped being involved in their lives when R.C. was ten years old. After her biological father left, R.C. lived with her siblings and the complainant's mother in an apartment in Harris County. Eventually, R.C.'s mother started dating, and appellant moved in with their family in 2003. Appellant made sure to tell the complainant that he was not the complainant's father and that he did not want the complainant to call him "dad."

According to R.C., when appellant first moved into the family's apartment, he slept in the primary bedroom with the complainant's mother and V.C., while R.C., the complainant, and L.C. slept in the second bedroom. Sometimes though, the complainant would sleep in the living room. After about a year, R.C., L.C.,

11

and V.C. began sharing a bedroom, and the complainant slept in the living room on the couch.

During the time appellant lived with the family, the complainant's mother worked overnight, and R.C. was not usually awake when the complainant's mother would return home from work. When the complainant's mother was gone in the evenings, appellant was in the home alone with R.C. and her siblings.[9] Appellant would usually stay in his bedroom, and he required the children to knock before entering the bedroom.

R.C. testified that when the complainant was a child, he would get in trouble with appellant for "the smallest things." One time, when R.C. was with the complainant's mother, L.C., and V.C. at the grocery store, the complainant went outside the apartment without permission. When he returned, appellant put him in a cold shower and said, "This is what you get for not listening and for not asking for permission." The complainant was the only child who was punished by appellant.[10] R.C. further explained that while appellant was living in her home, she saw the complainant go into appellant's bedroom "[a] few times," but she did not know why the complainant was inside the bedroom.

---

[9]     R.C. noted that appellant was a painter, and he did not work consistently. He would only take on "small gigs."

[10]    R.C. noted that as the complainant got older, he never wanted to be at home, and he would sign up for extracurricular activities so that he could stay longer at school. She also testified as to one occasion where appellant put the complainant in a closet for misbehaving.

12

R.C. also testified that on one occasion, when R.C. was about eleven or twelve years old and the complainant was seven or eight years old, appellant was alone with R.C. and her siblings in the apartment. While R.C. and her siblings were watching a movie, appellant came out of his bedroom and sat in the recliner with a blanket on top of him. Appellant then told R.C., the complainant, and L.C. to "get up," and he asked the complainant if he "had a pussy." Appellant then touched the complainant's penis over the complainant's clothing in front of R.C. and L.C. Appellant told the complainant to pull down his pants and show appellant his penis, and the complainant complied. Appellant also told L.C. and R.C. to pull down their pants, and they complied. Appellant said to the complainant, "These are pussies. You don't have this." R.C. then pulled up her pants and told her siblings to do the same and to go to their bedroom. R.C. told appellant that "what he was doing wasn't right." R.C. did not tell the complainant's mother about what had happened though because she was "in disbelief" and "in shock."

As to another incident, R.C. explained that when she was twelve years old, appellant called the complainant and R.C. to come to the bathroom. Appellant made the complainant lay on the floor without his pants or underwear on, and appellant told R.C. to sit on top of the complainant's penis without her pants or underwear on. Appellant then asked R.C. if the complainant's penis was "inside

13

[her]." According to R.C., the complainant's penis penetrated her vagina, and the complainant was crying. Appellant just stared at them. Afterward, R.C. ran to her bedroom. She did not tell the complainant's mother about what had happened because she was scared of getting into trouble. Two days after the incident, appellant "called [R.C.] over to his room and . . . told [her] that [she] better not say nothing" because there "were going to be a lot of consequences," like her siblings would be separated, the complainant's mother would go to jail, and R.C. would get deported.

R.C. noted that a similar incident happened a second time in the bathroom about a month or two after the first bathroom incident, but that time R.C. was bleeding from her menstrual cycle, and she and the complainant were scared. R.C. explained that the complainant's penis penetrated her vagina during the second incident as well. R.C. did not tell the complainant's mother or another adult because she was scared and felt disgusted.

R.C. further testified that when she was about twelve or thirteen years old, appellant called her to come into his bedroom and told her to shut the door behind her. Appellant was watching pornography on the television, covered with blankets, and masturbating on the bed. Appellant pulled the blankets off, and he was naked. He told R.C. to touch his penis and then grabbed her hand and held it on his penis so that she would cause him to ejaculate. After appellant ejaculated,

14

he told R.C. to leave the room and to not say anything. The complainant's mother was at work when this happened, and R.C. did not tell her what happened because she was scared.

R.C. noted that appellant made her "masturbate him" multiple times,[11] and when that happened, appellant would also penetrate R.C.'s vagina with his fingers. Appellant also put his mouth on R.C.'s vagina,[12] and he made R.C. perform oral sex on him. The first time that happened, R.C. was about fifteen years old, and she had gone to the store with appellant. Appellant parked their minivan in the parking lot, and appellant went to the back seat. He told R.C. to come back there with him, and he took off his pants and his underwear. Appellant asked R.C. if she "want[ed] to try something new." Appellant grabbed R.C.'s head and pushed it down to his penis. He kept his hand on the back of R.C.'s head the whole time, until she started to throw up.

R.C. further explained that when she was fourteen years old, she started sleeping with a pocketknife under her pillow because she felt like she needed to protect herself from appellant. One night she made herself go to bed earlier than usual because she thought "that would prevent [anything] from happening." But

---

[11]    R.C. estimated that appellant made her masturbate him about once a week. It was happening "on a normal basis."

[12]    During her testimony, R.C. described the incidents where appellant put his mouth on her vagina. And she testified that appellant had also rubbed his penis against her vagina for five to ten minutes. He stopped when he ejaculated. That occurred a handful of times according to R.C.

15

appellant came into her bedroom and whispered her name and told her "to come." When R.C. "looked away," appellant "grabbed [her] by the shoulder" and "pulled [her] shirt." R.C. then looked at appellant and "pulled out the knife and . . . told him . . . to leave [her] alone." Appellant "went pale," "[h]is eyes widened," and he walked out of the room.[13] After the knife incident, appellant stopped "messing with" her for about a year, until she was fifteen years old. Appellant then started calling her into his bedroom again and engaging in the same sexual behavior as before.

When R.C. was seventeen years old, she told appellant that she was not going to engage in anymore sexual encounters with him, and she ran away from home.[14] When R.C. was about twenty years old, the complainant's mother and appellant broke up. However, there were times where appellant would still stay at the complainant's mother's home for a few days.

---

[13] L.C. testified that she shared a bed with R.C., and R.C. always made L.C. sleep on the inside of the bed, closest to the wall. This meant that R.C. slept on the outside edge of the bed. One night, L.C. "felt a presence inside [the] [bed]room," and she could hear appellant walking across the floor. L.C. heard appellant say to R.C., "Let me see, let me see." R.C. told appellant, "No, leave me alone." R.C. then "pull[ed] out the knife she had under her pillow," and appellant "got afraid." He went back to his bedroom. L.C. thought that R.C. slept with a pocketknife "most of the nights."

[14] R.C. noted that she had run away twice when she was younger because of what appellant had been doing to her. And when she was about thirteen or fourteen years old, she told her grandmother that appellant had been touching her, but nothing really happened. That made her not want to talk about what appellant had done "ever again."

In total, R.C. estimated that appellant had sexually abused her for six or seven years. She believed that the abuse stopped when she was about seventeen years old.

L.C. testified that R.C., the complainant, and V.C. were her siblings. R.C. was the eldest, and the complainant and V.C. were younger than her, although she and the complainant were close in age. According to L.C., appellant was her stepfather.[15] He "came into [her] life" when she was about seven or eight years old and moved into the apartment where L.C.'s family was living in Harris County.[16]

Appellant and the complainant's mother shared a bedroom in the apartment, and in the beginning, R.C., the complainant, and L.C. shared a bedroom. V.C. was still little when appellant moved in, and she slept in the complainant's mother's room. But appellant told the complainant's mother that "girls [should] sleep with girls." So, the complainant began sleeping on the couch in the living room, and V.C. began sharing a bedroom with R.C. and L.C.

As to appellant's behavior while he lived with L.C.'s family, L.C. explained that appellant would say things like "girls go with girls and guys . . . go with guys,"

---

[15]     L.C. explained that her biological father had been "arrested and deported." L.C.'s biological father was abusive toward the complainant's mother, and on one occasion he "tried to kill [the complainant] in front of" L.C. Because of the trauma she experienced in her life, L.C. explained that she generally "kept" traumatic things to herself.

[16]     According to L.C., when appellant moved in with her family, V.C. was about two years old, and V.C. believed, during her childhood, that appellant was her biological father. L.C. testified that eventually, appellant "touched" V.C.

which meant that there were times when the complainant would stay behind at the apartment with appellant, while the complainant's mother, R.C., L.C., and V.C. went places. L.C. recalled that when the girls would return home, the complainant was often not in the apartment because he would "run away." On one occasion, L.C. went to the grocery store with the complainant's mother, R.C., and V.C., and when they returned home, appellant was outside screaming the complainant's name. L.C. went to find the complainant at a friend's house, and the complainant refused to come home.[17]

Further, L.C. testified that when appellant was in the apartment, he was always locked in the complainant's mother's bedroom. And appellant made the children knock on the bedroom door before they could enter the room. According to L.C., there were periods of time where the children would be alone in the apartment with appellant because the complainant's mother worked mostly at night.[18]

As to her interactions with appellant, L.C. recalled that one time, when she was about eight or nine years old, she was taking a bath in the bathroom in her family's apartment, with the shower curtain closed. Appellant came into the

---

[17]   L.C. additionally noted that the complainant tried to stay away from the apartment as much as possible; he was involved in many extracurricular activities at school. She also explained that the complainant had a hiding spot in the apartment, but L.C. never knew what the complainant was hiding from.

[18]   L.C. testified that the complainant's mother would leave for work at about 5:00 p.m.

18

bathroom "very quietly." Appellant pulled down his pants and sat on the toilet. He then peeked into the bathtub, where L.C. was "hunched into . . . a little ball" because she did not want him to see her naked. He asked L.C. what she was doing. He then told her to "[s]tand up." When L.C. asked why, appellant responded: "I want to see how you look, and just turn around." Appellant threatened that if L.C. did not comply with his request, he would tell the complainant's mother and "tell CPS," which L.C. thought mean that she would be separated from her siblings. L.C. complied, and her breasts, vagina, and bottom were exposed. Appellant also asked L.C., if she "want[ed] to see [him]," and L.C. told appellant, "No, I don't want to see you." Appellant then closed the shower curtain, stood up, pulled up his pants, and left the bathroom. L.C. stated that she did not tell anyone about happened because her response to experiencing trauma was to "hide in [her] little spot in [her] room."

L.C. also testified that when she was about nine or ten years old, her family and appellant went on a vacation to New Orleans, Louisiana, and they stayed with L.C.'s aunt and uncle in a townhouse. While there, L.C., V.C., the complainant's mother, and appellant all slept in the same bed. While napping, L.C. felt "a sensation with the sheets . . . going up and down, like the breeze." L.C. woke up, and appellant was masturbating under the bed covers. Because V.C. was sleeping between L.C. and appellant, L.C. moved V.C. away from appellant because she did

not want appellant to "hurt" V.C. or "do something to [V.C.] while she was still asleep." L.C. laid there facing away from appellant. Appellant then turned L.C. around, while he was masturbating and started touching L.C.'s vagina under her underwear. Appellant told L.C., "[D]on't let nobody touch you right here. Only me." Appellant continued touching L.C.'s vagina until he heard footsteps on the stairs. He then immediately turned around, put his back toward L.C., and stopped masturbating. When the complainant's mother opened the door to the bedroom, she asked if anyone was hungry, and appellant got up. L.C. stayed in the room with V.C. L.C. did not say anything to anyone at the time, but after the family returned from New Orleans, L.C. told R.C. about what had happened. L.C. did not tell an adult though because she was scared that no one would believe her.

L.C. further explained that after she and the complainant graduated from high school, appellant and the complainant's mother broke up due to appellant's cheating, and appellant "officially [moved] out of" the family's home. Appellant then dated another woman, who also had younger children. L.C. noted that there were still times when appellant would stay with the complainant's mother after they had broken up. L.C. did not like the fact that the complainant's mother was "trying to get [appellant] to come back." L.C. was upset that appellant had made the complainant's mother "cry," but not about appellant's cheating because she was "pretty okay with [appellant] leaving."

According to L.C., after she had her own child as a young adult, she visited the complainant's mother, and appellant was staying at the home. While L.C. changed her daughter's diaper, she felt that appellant was looking at her daughter's vagina, and it reminded her of "the way he [had] looked at" L.C. L.C. stopped visiting the complainant's mother after that because she did not want the complainant's mother to have appellant in her life.

When she was twenty-three years old, L.C. told her aunt about what appellant had done to her, and her aunt believed her. L.C.'s aunt told the complainant's mother, but the complainant's mother did not believe L.C. at first; she doubted L.C. A few days after L.C. made the disclosure, the complainant's mother called L.C. and told her, "Let's go to the police." L.C. went to speak with law enforcement officers along with the complainant, the complainant's mother, and V.C.

V.C. testified that appellant was her stepfather. He came into her life when she was about two or three years old, and he raised her. V.C. considered appellant to be her father, and she did not learn that appellant was not her biological father until she was about seven or eight years old.

V.C. further explained that she was the youngest child in her family. The complainant was six years older, L.C. was seven years older, and R.C. was ten

years older than she was.  V.C. described R.C. as "[t]he one that t[ook] care of [the siblings] a lot of the time," and L.C. was "like a second mother" to V.C.

As to her relationship with appellant, V.C. stated that growing up she "was daddy's little girl."  She had a close relationship with appellant, and he was always nice and loving toward her.  Appellant "was everything to" V.C.

In comparison, appellant always treated the complainant like "he was . . . a bother."  "[A] lot of the time, . . . [appellant] would just treat [the complainant] like crap," and appellant "made it seem like it was an inconvenience [to] hav[e] [the complainant] around."  The complainant would frequently "disappear[] off to friends' houses."  According to V.C., R.C. and the complainant's mother would often fight about appellant and that would cause R.C. to run away from home.  As to L.C., she kept her distance from appellant.

While appellant lived with V.C.'s family, appellant shared a bedroom with the complainant's mother.  V.C. would sometimes sleep in the same bedroom as her sisters, but she would also sleep in the bedroom with the complainant's mother and appellant.  The complainant slept in the living room most of the time.  According to V.C., while growing up, there were times where appellant was home alone with her and her siblings, without the complainant's mother being present.  And whenever appellant was at home, he was mostly in his bedroom.  V.C. had to knock on the door before she could enter appellant's bedroom.  V.C. never saw

appellant doing anything with the complainant, R.C., or L.C. in the bedroom. The few times that appellant was in the living room, instead of his bedroom, it was just V.C. and him watching television together because V.C.'s siblings would choose to go to their room.

As to appellant's sexual interactions with V.C., V.C. testified that when she was about seven or eight years old, she lived in an apartment in Harris County. One day, V.C. was laying in her bedroom. The complainant's mother told appellant to go lay down with V.C. because V.C. did not like to sleep alone and the complainant's mother had to leave the home. Appellant laid down with V.C. and grabbed her shorts, asking "[W]hat is this." V.C. told appellant, "Those are my shorts." Appellant then grabbed V.C.'s underwear and asked, "What is this." Next, appellant "went under [her] underwear" and "grabbed" V.C.'s vagina, asking "What is this." V.C. "stayed quiet" because she did not know how to respond. Appellant grabbed V.C.'s vagina for about a minute, and then appellant got up and walked out of the room. V.C. went to sleep.

A couple of days later, V.C. told R.C. and L.C. about what had happened. R.C. "got mad" and told V.C., "Don't ever let him touch you like that because he's not even your real dad." L.C. then got mad at R.C., and told R.C., "She's not

23

supposed to know that yet." R.C. also told V.C. that "no one[] [was] going to believe" her.[19] V.C. believed R.C.

Later, when V.C. was about seventeen years old, L.C. disclosed what appellant had done to her, and L.C. also reminded V.C. that appellant had touched her too. At the time, appellant was "trying to come back into [V.C.'s] life and [L.C.] didn't see that as okay." And L.C. did not want appellant around V.C. or their family. At first, V.C. was mad at L.C. because V.C. thought that L.C. just did not want her to have a relationship with her "dad." But V.C.'s memory came back in "bits and pieces," and V.C. told her therapist about appellant touching her vagina. V.C.'s therapist told her that blocking out that memory "from [her] head" was "pretty much a normal trauma response." After her therapy session, V.C. went to the police station, with the complainant's mother and L.C., to disclose what had happened to her.

Finally, V.C. testified that appellant and the complainant's mother ended their relationship when V.C. was about thirteen years old. The complainant's mother caught appellant cheating, and appellant "left to be with" his girlfriend.

Houston Police Department Officer D. Yoon testified that he was in charge of investigating the sexual abuse claims that L.C. had made against appellant. L.C.

---

[19] About a year later, R.C. told V.C. that appellant "would go into [R.C.'s] bedroom and that one time she took out a knife because he was going to go ahead and be touching on her."

alleged that appellant had touched her vagina "under the blankets" when they were sharing a bed in Louisiana. L.C. explained that she had been laying in a bed with V.C., and she moved V.C. away from appellant. Appellant began touching L.C. over her clothes, but under the bed covers. Appellant then progressed to touching L.C.'s vagina under her clothes. L.C. also described to Yoon the incident when appellant "c[ame] into the bathroom when[] she was taking a shower," "forc[ed] [L.C.] to expose herself to him," and offered to show L.C. his penis.

Officer Yoon further testified that during his investigation, he spoke to the complainant, R.C., and V.C. as well. According to Yoon, the complainant alleged that "a series of events of sexual assault [occurred] starting at a young age leading into adulthood" and that the sexual abuse "escalat[ed] once [the complainant] . . . reached middle school." For instance, appellant made the complainant "masturbate hi[m]," and appellant showed the complainant his penis. Appellant also had the complainant perform oral sex on him. The sexual abuse began when the complainant was in elementary school, and the complainant "outlined abuse that stretched all the way from when[] he was a very small child all the way until he was about [nineteen] years old." The complainant and R.C. also told Yoon that appellant had "forced them to have incestuous sex" at least once. As to that instance, appellant made the complainant lay on the bathroom floor and made R.C. get on top of the complainant. R.C. also told Yoon that appellant made

25

her "masturbate" him when she was a teenager. And R.C. described appellant forcing R.C. to perform oral sex on him, and appellant touching her vagina. When R.C. spoke to Yoon, she detailed "a long span of sexual abuse that she suffered" at the hands of appellant.

As to V.C., Officer Yoon testified that V.C. did not know anyone else other than appellant as her father. And while in therapy, V.C. realized that she had blocked a memory of appellant touching her vagina. Appellant touched V.C. on top of her clothing and asked, "What are these." Appellant then touched V.C. on top of her underwear and asked V.C., "What is this." When appellant touched V.C.'s vagina under her underwear, he asked, "What is this."

When Officer Yoon spoke to the complainant's mother and the children's grandmother, both admitted that they did not initially believe the children about the sexual abuse. But then they "came around" and believed the children.

Officer Yoon also noted that he spoke to appellant during his investigation, and appellant said that "everyone else was jealous of the relationship he had with [V.C.] and they were out to get him." Appellant said that none of the children, other than L.C., "would have any reason to say anything bad about him." Appellant denied the allegations against him.

26

Appellant testified that he met the complainant's mother in 2004 or 2005, and the complainant's mother had four children—R.C., L.C., the complainant, and V.C. R.C. was about ten years old when appellant met her.

When appellant lived with the complainant's mother, everyone in the home would get up about 6:30 a.m. Appellant would get ready for work and leave the home in the morning. The complainant's mother would stay in the home during the day. When appellant would arrive home around 6:00 p.m., the complainant's mother would still be at home, and the children would be home from school. The complainant's mother would leave the home to go to work around 5:30 p.m. or 6:00 p.m., and she would return home about 10:00 p.m. or 11:00 p.m. Appellant would be alone with the children at home for about four or five hours in the evenings, and he had "access to all of the [children] when the [complainant's mother] was gone." During that time, the children would play outside until it "beg[an] getting dark."[20] Appellant would then get the children to come inside and have dinner. The children would watch television and play games, while appellant was in his bedroom. Appellant stated that the door to his bedroom was not locked, and the door would be "slightly open or open" while he watched television. The children would stay up late in the living room, and they went to bed on their own. The children would be asleep before the complainant's mother got home from

---

[20] According to appellant, the children were always together when they left to go outside and when they came back inside.

27

work.  Appellant did note that there were times that the children would come into his bedroom individually when the complainant's mother was not in the home, but appellant was "[n]ot often" alone in his bedroom with the complainant.

As to the allegations against him, appellant denied having anal sex with the complainant, and he denied making the complainant perform oral sex on him. Appellant stated that he never had a "homosexual relationship" with the complainant.[21]  And he denied that he was ever left alone with the complainant in the home when the complainant's mother and siblings went to church.

Further, appellant denied touching R.C.'s vagina, "rub[bing] [his] penis on her vagina," and forcing R.C. to perform oral sex on him.[22]  And appellant denied ever touching L.C. inappropriately or fondling L.C. during a trip to Louisiana.[23] He also stated that the children slept together in a bedroom during that trip, but he slept in the living room of the house where the family was staying.  He was never in a bedroom alone with L.C. and V.C.  Additionally, appellant denied touching V.C.  He stated that he went to a therapy session with V.C., and the therapist explained that V.C. had anxiety because he "had left [V.C.'s] life."  To appellant, V.C. was his daughter, and it made him feel "[v]ery badly" that she had made

---

[21]  Appellant also denied that the complainant ever ran away to a friend's house.

[22]  Appellant admitted that he would take R.C. to the store with him, and he drove a minivan at times.

[23]  Appellant admitted that he met L.C.'s child when the child was about eighteen months old.

28

allegations against him. Appellant never punished V.C. because "[s]he was the baby" in the family.

Appellant also testified that his relationship with the complainant's mother ended because she found out that appellant was cheating on her with another woman. The children hated the other woman and were angry with appellant for cheating on the complainant's mother and abandoning V.C. L.C., in particular, felt that appellant was not taking V.C.'s feelings into account after appellant moved on with the other woman, and she threatened appellant that he was "going to get it from [her]." The complainant had also threatened appellant because appellant was in a relationship with the other woman. Appellant admitted that the first time he had ever mentioned the children threatening him was during his testimony at trial.

**Jurisdiction**

In his second issue, appellant argues that the trial court lacked subject matter jurisdiction over his case because "the indictment failed to state an offense."

"A trial court's jurisdiction over a criminal case consists of the power of the court over the subject matter of the case, coupled with personal jurisdiction over the accused." *Jenkins v. State*, 592 S.W.3d 894, 898 (Tex. Crim. App. 2018) (internal quotations omitted). "The presentment of a valid indictment vests the district court with jurisdiction of the cause." *Id.*; *see also* TEX. CONST. art. V, § 12(b). Even if an indictment has a substantive defect, it is sufficient to confer

personal and subject-matter jurisdiction under the Texas Constitution if it: (1) "charge[s] a person" and (2) "charge[s] the commission of an offense." *Jenkins*, 592 S.W.3d at 898, 901 ("An indictment can be defective, but still be an indictment that vests the court with jurisdiction."); *see also Teal v. State*, 230 S.W.3d 172, 179 (Tex. Crim. App. 2007) (for indictment to be constitutionally valid, and thus confer jurisdiction on trial court, it need only allege that person committed offense). An indictment must be "clear enough to give a[] [defendant] adequate notice" of the charge against him and to enable the trial court, appellate court, and defendant to "identify what penal-code provision is alleged and whether that penal-code provision is one that vests jurisdiction in the trial court." *Jenkins*, 592 S.W.3d at 901 (internal quotation marks omitted); *Kirkpatrick v. State*, 279 S.W.3d 324, 328 (Tex. Crim. App. 2009). Whether an indictment is sufficient to confer jurisdiction presents a question of law, which we determine de novo. *Leone v. State*, 508 S.W.3d 346, 347 (Tex. App.—Fort Worth 2014, pet. ref'd).

Appellant asserts that the indictment in this case failed to "charge the commission of an offense."[24] To resolve this issue, we look to the indictment "as a

---

[24] Appellant does not assert that the indictment failed to "charge a person." *See Jenkins v. State*, 592 S.W.3d 894, 898 (Tex. Crim. App. 2018). Indeed, the indictment listed appellant's full name, race, date of birth, gender, address, and county identification number; it bore the title: "The State of Texas vs. Salvador Jimenez Coronado," and it alleged that "Salvador Jimenez Coronado, hereinafter styled the Defendant" committed the charged offense. *See id.* at 901–02; *Thetford v. State*, No. 02-18-00488-CR, 2021 WL 278913, at *6 (Tex. App.—Fort Worth

whole." *Jenkins*, 592 S.W.3d at 903. In other words, we must determine if the "face of the charging instrument [was] clear enough to give [the defendant] adequate notice of the charge against him." *Id.* at 901 (internal quotations omitted). "[I]n order for a defect to render the instrument a non-indictment, the defect must make it impossible for the defendant to know with what offenses he had been charged." *Id.* (internal quotations omitted). If the allegations in the indictment are clear enough for the defendant to identify the offense alleged, then the instrument is sufficient to confer jurisdiction, regardless of whether an element of the offense is absent. *See Teal*, 230 S.W.3d at 180.

A person commits the offense of continuous sexual abuse of a young child if (1) the person, (2) who is seventeen years old or older at the time of the commission of each of the acts, (3) commits a series of two or more acts of sexual abuse (4) during a period of thirty or more days, and (5) at the time of the commission of each of the acts the victim is younger than fourteen years old. TEX. PENAL CODE ANN. § 21.02(b); *see also Hines v. State*, 551 S.W.3d 771, 781–82 (Tex. App.—Fort Worth 2017, no pet.). An "act of sexual abuse" means an act that violates one or more specified penal code sections, including an act

Jan. 28, 2021) (mem. op., not designated for publication), *rev'd in part on other grounds*, No. PD-0258-21, 2021 WL 2674484, at *1 (Tex. Crim. App. June 30, 2021) (not designated for publication).

constituting indecency with a child,[25] sexual assault,[26] aggravated sexual assault,[27] and sexual performance by a child.[28]  *See* TEX. PENAL CODE ANN. § 21.02(c) (internal quotations omitted).

Here, the indictment listed, as the charge against appellant: "FELONY CHARGE: Sexual Abuse of a Child – Continuous" and alleged that appellant,

> on or about September 1, 2007, continuing through October 30, 2010, did then and there unlawfully, during a period of time of thirty or more days in duration, commit at least two acts of sexual abuse against a child younger than fourteen years of age, including an act constituting the offense of aggravated sexual assault of a child, committed against [the complainant] on or about September 1, 2007, and an act constituting the offense of sexual assault of a child, committed against [the complainant] on or about October 30, 2010, and [appellant] was at least seventeen years of age at the time of the commission of each of those acts.[29]

When reviewing the indictment as a whole and comparing it to Texas Penal Code section 21.01(b), the allegations in the indictment are clear enough for appellant to identify the offense alleged and would have given appellant adequate notice of the charge against him.  *See Jenkins*, 592 S.W.3d at 901; *Teal*, 230 S.W.3d at 180; *see also Perry v. State*, No. 06-21-00076-CR, 2022 WL 1159539,

---

[25]   *See* TEX. PENAL CODE ANN. § 21.11(a)(1).

[26]   *See id.* § 22.011.

[27]   *See id.* § 22.021.

[28]   *See id.* § 43.25.

[29]   The original indictment contained different alleged dates for the commission of the alleged offense.  The original indictment was amended, without objection, to reflect the dates listed above.

at \*2 (Tex. App.—Texarkana Apr. 12, 2022, no pet.) (mem. op., not designated for publication) (where indictment's heading stated, "CHARGE: ASSAULT FAMILY OR HOUSEHOLD MEMBER W/PREV. CONV" and "THIRD DEGREE FELONY," penal code section was clearly ascertainable by district court and defendant). Thus, we hold that the indictment was sufficient to vest the trial court with subject-matter jurisdiction.[30]

We overrule appellant's second issue.

## Directed Verdict

In his first issue, appellant argues that the trial court erred in denying his motion for directed verdict because the indictment did not allege a proper underlying offense to support the alleged offense of continuous sexual abuse of a young child.

---

[30] To the extent that appellant's second issue can be construed as a complaint that the indictment in this case contained a defect, we note that a defendant cannot complain on appeal of any defect, error, or irregularity of form or substance in an indictment if he did not object to the defect, error, or irregularity before trial. *See* TEX. CODE CRIM. PROC. ANN. art. 1.14(b). Here, appellant did not raise his complaint in the trial court that the indictment "fail[ed] to describe an offense" because sexual assault of a child "for a person under [fourteen] years of age is not an offense and it is one of the elements of the alleged "[c]ontinuous [s]exual [a]buse of a [c]hild indictment." *See Walker v. State*, 594 S.W.3d 330, 338–40 (Tex. Crim. App. 2020) ("The lack of a valid predicate offense . . . amounted to a substantive defect in the charging instrument, not the lack of an indictment altogether. Appellant did not object to th[e] defect prior to trial, so she cannot complain about it now."); *see also Teal v. State*, 230 S.W.3d 172, 182 (Tex. Crim. App. 2007) (unobjected-to indictment which failed to allege of two elements necessary to establish offense of felony grade nevertheless served to vest subject-matter jurisdiction in district court).

33

A person commits the offense of continuous sexual abuse of a young child if (1) the person, (2) who is seventeen years old or older at the time of the commission of each of the acts, (3) commits a series of two or more acts of sexual abuse (4) during a period of thirty or more days, and (5) at the time of the commission of each of the acts the victim is younger than fourteen years old. TEX. PENAL CODE ANN. § 21.02(b); *see also Hines*, 551 S.W.3d at 781–82. As stated above, the indictment in this case alleged that appellant,

> on or about September 1, 2007, continuing through October 30, 2010, did then and there unlawfully, during a period of time of thirty or more days in duration, commit at least two acts of sexual abuse against a child younger than fourteen years of age, including an act constituting the offense of aggravated sexual assault of a child, committed against [the complainant] on or about September 1, 2007, and *an act constituting the offense of sexual assault of a child, committed against [the complainant] on or about October 30, 2010*, and [appellant] was at least seventeen years of age at the time of the commission of each of those acts.

(Emphasis added.)

Appellant argues that the indictment failed to properly allege one of the acts of sexual abuse because the offense of "sexual assault of a child younger than [fourteen years old]" does not exist and "[t]he jury was forced to deliberate on a [c]ontinuous [sexual abuse of a young child] allegation that was not correctly pled." And because of all of this, the trial court erred in denying his motion for directed verdict. But at trial, appellant did not move for a directed verdict based on the argument he now raises in his briefing. Thus, he has not preserved for

34

appellate review his complaint that the trial court erred in denying his motion for directed verdict. *See* TEX. R. APP. P. 33.1(a); *Resendiz v. State*, 112 S.W.3d 541, 547 (Tex. Crim. App. 2003) (holding where defendant's trial objection "does not comport with" issue he raises on appeal, he has not preserved issue for review); *Moody v. State*, No. 13-08-00212-CR, 2009 WL 2605904, at *4 n.3 (Tex. App.— Corpus Christi–Edinburg Aug. 26, 2009, pet. ref'd) (mem. op., not designated for publication) (holding defendant did not preserve complaint trial court erred in denying motion for directed verdict where argument on appeal did not comport to argument made in trial court); *Burnham v. State*, 821 S.W.2d 1, 3 (Tex. App.— Fort Worth 1991, no pet.) (same); *see also White v. State*, 458 S.W.3d 188, 191 n.6 (Tex. App.—Texarkana 2015, no pet.) (considering whether basis for defendant's motion for directed verdict comported with point of error raised in appellate court).

Further, to the extent that appellant's first issue can be read, not as a complaint about the trial court's denial of his motion for directed verdict, but simply as a complaint that the indictment in this case was defective, appellant did not object to any defect, error, or irregularity of form or substance in the indictment before the date that trial on the merits commenced. Thus, he waived his right to complain about the purported defect in the indictment on appeal. *See* TEX. CODE CRIM. PROC. ANN. art. 1.14(b); *Jenkins*, 592 S.W.3d at 902; *Duron v. State*, 915 S.W.2d 920, 921–22 (Tex. App.—Houston [1st Dist.] 1995) (defendant

35

waived complaint on appeal that indictment "did not allege an offense" because defendant did not object before date trial began), *aff'd*, 956 S.W.2d 547 (Tex. Crim. App. 1997); *see also Williams v. State*, 356 S.W.3d 508, 519 (Tex. App.— Texarkana 2011, pet. ref'd) (defendant did not preserve his argument that indictment did not allege essential elements of offense, where defendant failed to object before trial).

Based on the foregoing, we hold that appellant has not preserved for appellate review his complaint about the denial of his motion for directed verdict or his complaint about the indictment raised in his first issue.

We overrule appellant's first issue.

### Admission of Evidence

In his third issue, appellant argues that the trial court erred in admitting V.C.'s testimony that appellant "had touched her on and underneath her underwear when she was seven or eight" years old because the testimony was unreliable and "its probative value was substantially outweighed by a danger of unfair prejudice."

A trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.

36

Crim. App. 1990). A trial court's decision to admit evidence will be upheld if it is "within the zone of reasonable disagreement." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018); *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). A trial court's ruling on the admission of extraneous offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling, even if the trial court gives the wrong reason for the right ruling. *Id.*

"An extraneous offense is any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d 254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (internal quotations omitted). Generally, Texas Rule of Evidence 404(b) prohibits the admission of extraneous offense evidence to prove a person's character or to show that the person acted in conformity with that character. *See* TEX. R. EVID. 404(b). But when a defendant is being prosecuted for the offense of continuous sexual abuse of

37

a young child, evidence that the defendant has committed one or more of the enumerated sexual offenses against a child, including the offense of indecency with a child, sexual assault of a child, or aggravated sexual assault of a child,[31] "may be admitted . . . for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." TEX. CODE OF CRIM. PROC. ANN. art. 38.37, § 2; *see also Jeansonne v. State*, 624 S.W.3d 78, 94–95 (Tex. App.—Houston [1st Dist.] 2021, no pet.) ("Essentially, article 38.37 is an evidentiary rule applicable to certain types of sexual abuse cases . . . that supersedes the application of Texas Rule of Evidence 404(b), and makes admissible certain extraneous offense evidence that [r]ule 404(b) does not."); *Belcher v. State*, 474 S.W.3d 840, 844 (Tex. App.—Tyler 2015, no pet.) (article 38.37, section 2(b) allows admission of evidence that defendant had previously committed certain sexual offenses against non-victims of charged offense).

But even if extraneous offense evidence is admissible under Texas Code of Criminal Procedure article 38.37, a trial court has a nondiscretionary obligation to weigh the probative value of the evidence against any unfair prejudice of its

---

[31]  *See Wishert v. State*, 654 S.W.3d 317, 330 (Tex. App.—Eastland 2022, pet. ref'd) ("Article 38.37, [s]ection 2(b) allows for the admission of evidence that the defendant has committed a separate offense of *a sexual nature against a child*; the 'child victim' of the separate offense need not be the victim of the offense for which the defendant is currently on trial.").

admission when, as here, a defendant objects to the admission of extraneous offense evidence based on Texas Rule of Evidence 403. *Allen v. State*, 01-13-00784-CR, 2015 WL 5076288, at *9 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, pet. ref'd) (mem. op., not designated for publication); *Martines v. State*, 371 S.W.3d 232, 246–47 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When conducting a rule 403 analysis, a trial court must balance the probative force of and the proponent's need for the evidence against (1) any tendency of the evidence to suggest a decision on an improper basis, (2) any tendency of the evidence to confuse or distract the jury from the main issues, (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (4) the likelihood that presentation of the evidence will amount to undue delay. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Gorman v. State*, No. 01-18-00316-CR, 2019 WL 610739, *5 (Tex. App.—Houston [1st Dist.] Feb. 14, 2019, no pet.) (mem. op., not designated for publication). A rule 403 analysis favors the admissibility of relevant evidence, and a trial court's conclusion that the danger of unfair prejudice does not substantially outweigh the evidence's probative value is entitled to deference. *See Wilson v. State*, 473 S.W.3d 889, 900 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

Appellant complains about the admission of V.C.'s testimony at trial, asserting that it was unreliable and "more prejudicial than . . . probative." Here, we will presume, for purposes of this opinion, that the trial court erred in admitting V.C.'s testimony, but we must still perform a harm analysis to determine if the trial court's purported error requires reversal of the trial court's judgment.

The erroneous admission of evidence constitutes non-constitutional error. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Non-constitutional error requires reversal only if it affects the substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

We review the entire record to determine the effect or influence of the wrongfully admitted evidence on the jury's decision. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). In assessing the likelihood that the jury's decision was improperly influenced, we consider the testimony and physical

evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94; *Motilla*, 78 S.W.3d at 355–56. The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis. *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008); *see also Motilla*, 78 S.W.3d at 355–60. And we may consider closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error. *Motilla*, 78 S.W.3d at 355–56; *Hankins v. State*, 180 S.W.3d 177, 182 (Tex. App.—Austin 2005, pet. ref'd).

Here, the complainant testified in graphic detail about appellant's pattern of sexual abuse. The complainant explained to the jury how appellant sexually abused him on numerous occasions and in numerous ways over many years. The testimony of the complainant alone was sufficient to support appellant's conviction for the offense of aggravated sexual assault of a child.[32] *See* Tex. Code Crim. Proc. Ann. art. 38.07; *Martines*, 371 S.W.3d at 240; *see also Martinez v. State*, No. 10-16-00397-CR, 2018 WL 2142742, at *8 (Tex. App.—Waco May 9, 2018, no pet.) (mem. op., not designated for publication) (holding error in admission of complained-of extraneous offense evidence did not affect defendant's substantial

---

[32] Although appellant was charged with the offense of continuous sexual abuse of a young child, the jury found appellant guilty of the lesser-included offense of aggravated sexual assault of a child. *See Price v. State*, 413 S.W.3d 158, 163 (Tex. App.—Beaumont 2013), *aff'd*, 434 S.W.3d 601 (Tex. Crim. App. 2014).

rights, where complainant "specifically [testified] about the sexual assaults perpetrated by" defendant).

Additionally, although appellant complains about the admission of V.C.'s testimony that appellant "grabbed" her vagina once, he does not complain about the admission of R.C.'s and L.C.'s testimony which detailed numerous other extraneous offenses committed by appellant. R.C., for instance, provided graphic details as to the many instances, over many years, of sexual abuse that appellant perpetrated against her, including forcing R.C. to pull down her pants to show her vagina, forcing R.C. and the complainant to engage in sexual intercourse, forcing R.C. to masturbate appellant, forcing R.C. to perform oral sex on appellant, and penetrating R.C.'s vagina with his fingers on multiple occasions. And L.C. testified that appellant forced her to expose her breasts, vagina, and bottom to him, and that he touched her vagina while he was masturbating. Further, L.C. testified, without objection, that appellant had "touched" V.C. as well. *See Duncan v. State*, 95 S.W.3d 669, 672 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) ("Any error in admitting evidence is cured where the same evidence comes in elsewhere without objection.").

Even though the State, during its closing argument, referenced V.C.'s testimony, it also referenced the testimony that the jury heard from the complainant, R.C., and L.C., about which appellant does not complain. And we

42

cannot say that the State overly emphasized V.C.'s testimony in its closing argument. *See, e.g.*, *Tipton v. State*, No. 10-03-00385-CR, 2005 WL 241229, at *2 (Tex. App.—Waco Feb. 2, 2005, pet. ref'd) (mem. op., not designated for publication) (holding erroneous admission of extraneous offense evidence was harmless even though State referred to extraneous offense in its closing argument).

Finally, the trial court's instructions to the jury addressed and limited the jury's use and consideration of any extraneous offense evidence admitted during the guilt phase of trial, which can minimize any harm resulting from the admission of the complained-of testimony.[33] *See Transue v. State*, No. 02-22-00155-CR, 2023 WL 5114302, at *9 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op., not designated for publication) ("[A]n instruction [in the jury charge] regarding extraneous offense evidence can minimize any harm resulting from . . . admitting the evidence of the [extraneous] offense."); *Wishert v. State*, 654 S.W.3d 317, 334 (Tex. App.—Eastland 2022, pet. ref'd) (holding any potential harm in admission of extraneous-offense evidence was mitigated by trial court's limiting instruction in jury charge); *Martinez*, 2018 WL 2142742, at *8 (holding error in admission of complained-of extraneous offense evidence did not affect defendant's substantial rights, where trial court instructed jury it could only

---

[33] During closing argument, the trial court also instructed the jury, "[Y]ou will follow the charge. The charge has the law in it that you have to follow. What the attorneys tell you at this juncture may or may not be the law. You're bound by what the charge says the law is."

consider complained-of extraneous offense evidence if jurors believed beyond reasonable doubt that defendant committed act).  We generally presume that the jury followed the limiting instruction of the trial court.  *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

After examining the record as a whole, we have fair assurance that the alleged erroneous admission of V.C.'s testimony did not influence the jury or had but a slight effect.  Accordingly, we hold that appellant was not harmed by the admission of V.C.'s testimony.

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.

Do not publish.  TEX. R. APP. P. 47.2(b).